UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| | ) | |
| UNITED STATES OF AMERICA | ) | CRIMINAL NO. |
| | ) | |
| v. | ) | VIOLATIONS: |
| | ) | 18 U.S.C. § 1343 (Wire Fraud) |
| SKIFTER AJRO, | ) | 15 U.S.C. §§ 78j(b) & 78ff(a) (Securities Fraud) |
| | ) | |
| Defendant. | ) | **05 CR 10194 NMG** |
| | ) | |

## INFORMATION

The United States Attorney Charges:

## GENERAL ALLEGATIONS

### Relevant Persons and Entities

1.     At all times material to this Information, Prudential Securities, Inc. ("PSI") was a

broker-dealer registered with the United States Securities and Exchange Commission ("SEC")

and the National Association of Securities Dealers ("NASD"), with its principal place of business

in New York, New York. At all times material to this Information, PSI had a branch office

located in Boston, Massachusetts. From at least 1998 through June 30, 2003, PSI was an indirect

wholly owned subsidiary of Prudential Financial, Inc. ("Prudential Financial"). On July 1, 2003,

certain assets of PSI were transferred to Wachovia Securities LLC ("Wachovia"), a joint venture

between Wachovia Corporation and Prudential Financial. Wachovia's principal place of

business is Richmond, Virginia. Following the asset transfer, Wachovia continued to operate the

former PSI branch in Boston, Massachusetts. This Information refers to PSI and Wachovia

collectively as "PSI."

2.      At all times material to this Information, Defendant SKIFTER AJRO ("AJRO") was an individual who lived in Massachusetts. At all times material to this Information, AJRO was employed as a financial advisor by PSI.

3.      At all times material to this Information, AJRO worked as part of a group of financial advisors that included Martin J. Druffner ("Druffner") and Justin F. Ficken ("Ficken"). At all times material to this Information, Druffner, Ficken and AJRO worked as partners, sharing, among other things, client responsibilities, trade execution responsibilities and commissions. In this Information, Druffner, Ficken and AJRO are referred to collectively as the "Druffner Group."

## The Scheme to Defraud

### Overview

4.      AJRO was a member of the Druffner Group, a group of brokers at PSI who engaged in deceptive and fraudulent trading in shares of mutual funds. AJRO joined the Druffner Group in or about April 2001. From that point in time through in or about October 2003 when AJRO and the other members of the group left PSI, AJRO defrauded mutual fund companies (i.e., organizations that manage mutual funds) and the companies' mutual funds by employing various deceptive and fraudulent acts and practices to execute prohibited "market timing" trades on behalf of seven "hedge fund" clients. As a member of the Druffner Group, AJRO generated for himself over $700,000 in gross commissions and over $200,000 in net commissions from his deceptive and fraudulent trading in mutual fund shares.

5.      Although AJRO's deceptive and fraudulent conduct was wide-ranging, it consisted of the following three basic categories of conduct: (1) creating and using multiple

2

accounts, often with different names, to conceal from fund companies both the identity of the clients engaging in the timing and the true extent of the clients' market timing; (2) creating and using multiple representative identification numbers (called FA Numbers) to conceal from fund companies both his identity and the fact that other members of the Druffner Group were conducting prohibited timing trades; and (3) making affirmative misrepresentations and material omissions to employees at fund companies about the true nature and extent of the Druffner Group's market timing trading.

6.      By this conduct, AJRO intended to, and did, deceive fund companies into processing market timing trades for the Druffner Group's clients that the fund companies would otherwise have rejected. He engaged in this conduct after he was notified, explicitly and repeatedly, both that fund companies prohibited his clients' trading activity and, in some cases, that fund companies had banned him, and the other two members of the Druffner Group, from placing any trades because of their repeated violations of fund companies' prohibitions on market timing.

## Background

7.      A mutual fund is a regulated investment entity that issues shares to the public and typically invests its shareholders' money in a "basket" of underlying securities (e.g., stocks, bonds, etc.). A mutual fund "share" represents an ownership interest in the fund's "basket" of securities. Mutual fund shares are, themselves, securities regulated by the SEC.

8.      Typically, mutual fund shares are designed to be long term, "buy and hold," investments. They are managed so as to maximize returns for long term investors in the fund.

3

9.     "Market timing" refers to the practice of making excessive short term trades in shares of mutual funds. Basically, market timing involves frequent movement in and out of mutual funds to exploit inefficiencies in the way mutual funds calculate the value of fund shares, called the "net asset value" or "NAV." Often, the NAV of mutual fund shares, which is set once a day, does not fully reflect the value of the underlying assets held by a fund. By trading into a fund on a short term basis, a market timer can purchase a mutual fund share at a price (NAV) below the value of the "basket" of underlying assets. Once the shares are re-priced to reflect the change in value of the underlying assets, the market timer can then redeem the shares at the higher share value. Market timing is sometimes referred to as "excessive trading," "abusive trading," "day trading," or "frequent trading." This type of trading includes not only purchases into and redemptions out of a fund family, but also exchanges within a fund family (e.g., shifting funds from a money market fund to an international fund both managed by the same fund family).

10.     Market timing comes in different permutations. These permutations include, among others, "time zone arbitrage" and "momentum investing." In "time zone arbitrage," a market timer exploits inefficiencies in the way mutual funds that hold international stocks price the funds' NAV. Typically, a mutual fund calculates its NAV as of 4:00 p.m. U.S. Eastern Time, which is when the major U.S. stock markets close. In the case of a U.S.-based mutual fund holding international stocks, however, the fund's NAV will often be based on the closing price of the underlying international stocks held by the mutual fund. International stocks, however, are often traded on non-U.S. stock markets, which usually close earlier than the United States markets. Asian markets, for example, close early in the morning, even before the United States

4

markets open. Consequently, the prices of the international stocks do not fully reflect the events occurring while the United States markets are open. When the international markets next open, the stocks traded on those markets will typically follow the direction of the stocks in the United States.

11.     Thus, if something significant occurs in the United States following the close of the international markets that causes the United States markets to move up, it is highly likely that the price of international stocks will move up the next trading day. The NAV of the U.S. mutual fund holding those stocks, however, is typically based on the earlier closing prices on the international markets. When the fund's NAV is calculated the next day, it will likely include the gain in the international markets that often occurs following the previous day's gain in the United States markets.

12.     By quickly entering and exiting an international fund to take advantage of the delay in pricing of the fund's NAV, a market timer can capture that gain without incurring the risk faced by the long term shareholders in the fund. By capturing that gain and then exiting the fund, the timer takes a percentage of the gain away from the long term, buy and hold shareholders (a concept called "dilution").

13.     Another form of mutual fund market timing is "momentum investing." In this type of investing a market timer takes advantage of predictable short term movements in the NAV of mutual fund shares based on market indicators. Often, such momentum investing in mutual fund shares focuses on mutual funds trading in less liquid securities, such as small capitalization stocks or high yield bonds. In such cases, the NAV of mutual funds holding such securities predictably follows market events that affect the value of the underlying securities held

5

by the fund but are not yet reflected in the NAV. This type of timing activity allows a market timer a similar opportunity to capture a gain in the NAV when the NAV catches up to the market event as exists in time zone arbitrage.

14.     Market timing in mutual funds can be a very profitable strategy. For example, one of the Druffner Group's clients, Chronos Asset Management, Inc. ("Chronos") noted in a December 2001 brochure that its market timing strategy offered an annual return of between 25% and 30% from 1995 through 2001, as compared to an annual return of between 10% and 15% for the Standard and Poor's 500 index ("S&P 500") for the same period of time. Chronos also noted in that brochure that it offered those returns with less volatility than that of the S&P 500.

15.     Market timing, however, is harmful to the majority of fund shareholders, who hold mutual funds as long term investments. Basically, market timing harms long term investors by lowering the long term return of funds: it dilutes the value of long term mutual fund shareholders' shares; it raises transaction costs for funds; and it is disruptive to fund management. One Druffner Group client has recognized that market timing, when done in volume, can have a "devastating cost" to funds.

16.     For this reason, many fund families prohibit market timing and maintain policies and procedures to detect and prevent market timing. As one fund company, the General Electric Family of Funds ("GE Funds"), put it in a letter rejecting market timing activity:

> Market timing can prove very harmful to mutual fund performance because short-term and excessive trading increases expenses and is disruptive to portfolio management strategies. Market timing is also the antithesis of the long-term investment philosophy of mutual funds in general and the GE Family of Funds [ ] in particular.

6

Other fund families have noted similar problems with market timing:

*Eaton Vance Management ("Eaton Vance")*:

> Excessive transaction activity interferes with fund management,
> negatively affects fund performance, and ultimately results in
> increased expenses to shareholders.

*Ivy Mackenzie Services Corp. ("Ivy Funds")*:

> When market timers make sudden and large changes in their
> investments, they may disrupt a portfolio manager's strategy by
> compelling the manager to sell securities, which he or she had
> intended to hold for longer periods. This means that a fund may
> miss out on potential capital appreciation. Trading costs to a fund
> also increase when excessive exchanging occurs. Lower expenses
> benefit shareholders by increasing a fund's total return; conversely
> these higher expenses are unfairly borne by the fund's remaining
> shareholders.

*American Century Investments ("American Century")*:

> Excessive, short-term (market timing) or other abusive trading
> practices may disrupt portfolio management strategies and harm
> fund performance. To minimize harm to the funds and their
> shareholders, we reserve the right to reject any purchase order
> (including exchanges) from any investor we believe has a history
> of abusive trading or whose trading, in our judgement, has been or
> may be disruptive to the fund.

17.     During the period of time relevant to this Information, mutual fund companies had

employees whose responsibilities included identifying and stopping market timers. To identify

and stop potential market timing, these employees engaged in surveillance of trade activity in the

funds. For example, these employees often looked at trade size, scrutinizing more carefully

trades made over a certain dollar threshold. They also watched trading in certain funds that

typically saw more timing activity than others, such as international funds. They also identified

accounts (usually by identifying an account number) associated with market timing. When they

7

detected an account owner market timing, they tried to stop the activity, usually by issuing a warning. If the account owner persisted in market timing, they often blocked the account's trading privileges and, in some cases, barred the account owner from trading in the fund company's funds.

18.     Despite the prohibitions on market timing imposed by many mutual fund companies, a number of "hedge funds" employed mutual fund market timing as an investment strategy and, in doing so, used a variety of deceptive and fraudulent practices to defeat mutual fund companies' efforts to detect and block their activity. The term "hedge fund" is a generic term referring to unregulated investment pools, usually run by sophisticated investors. These hedge funds recognized that market timing was a very profitable investment strategy. They also recognized, however, that a significant impediment to their market timing strategy was that, if detected, many of the fund companies would block their market timing trading. Consequently, hedge funds engaged in a deceptive and fraudulent trading strategy that hedge fund personnel referred to as "undisclosed" or "under the radar" market timing. Basically, "under the radar" market timing consisted of masking or disguising market timing trades from the fund companies so that the fund companies would process timing trades that they otherwise would have blocked.

19.     As part of their under the radar strategy, some market timing hedge funds employed the Druffner Group. By mid-2003, the Druffner Group had seven principal timer clients. They were, in chronological order: Chronos, based in Cambridge, Massachusetts (late 1998 or early 1999); Headstart Advisers ("Headstart"), based in the United Kingdom (1999); Pentagon Capital Management ("Pentagon"), based in the United Kingdom (2000); Ritchie Capital Management ("Ritchie") based in Illinois (2000); William Lester – General Partner

("Lester") based in Massachusetts (2002); Jemmco Capital ("Jemmco") based in New York (2002); and Graham Capital Management ("Graham") based in Connecticut (2003).

20.     Three of the clients – Headstart, Chronos and Ritchie – had relationships with banks that financed their activities. Three of these banks were Canadian Imperial Bank of Commerce ("CIBC"), Credit Lyonnais ("Credit Lyonnais") and Zurich Capital Markets ("ZCM"). As part of their relationship with these banks, Headstart, Chronos and Ritchie traded through PSI accounts owned by the banks. These accounts either bore the bank's name or the name of a subsidiary set up by the bank for the hedge fund to conduct market timing.

21.     As "financial intermediaries" (i.e., brokers standing between the hedge funds and the mutual fund companies), the Druffner Group was well situated to mask their hedge fund clients' trades in order to have the fund companies process trades they would otherwise have rejected. More specifically, the Druffner Group's employer, PSI, had agreements with a large number of mutual fund companies to sell their mutual funds to PSI clients. Accordingly, the Druffner Group was able to buy, sell or exchange, for its clients, shares in a wide variety of mutual funds, including shares in mutual funds run by PSI's parent company, Prudential Financial (and its affiliates), and shares in mutual funds independent of Prudential Financial (e.g., American Century, Van Kampen Investments, and many others).

22.     In addition, every trading day, PSI received from its clients large volumes of trade instructions for mutual fund shares (i.e., buys, sells, exchanges) for many different fund companies. PSI processed its mutual fund trade information through the National Securities Clearing Corporation ("NSCC"), a centralized information service linking financial intermediaries like PSI to a variety of mutual fund companies. Thus, instead of transmitting the

9

trade instructions to each separate mutual fund company directly, PSI transmitted the trade instruction data for a variety of mutual fund companies in bulk to the NSCC which, in turn, transmitted the PSI data out to each of the different fund companies.

23.    The Druffner Group exploited this mutual fund trading system to disguise the clients' trading from fund companies. Basically, the Druffner Group recognized that trades processed from PSI over the NSCC system to fund companies relied on identification numbers. The identification numbers sent from PSI included (a) a number identifying PSI as the brokerage firm, (b) a number identifying the PSI branch generating the order, (c) a number identifying the PSI account (known as a "BIN number"), and (d) a number identifying the particular broker assigned to the account at the time of the trade, called an FA Number (for "financial advisor number").

24.    To stop timing activity from a PSI client or broker, the fund companies had to identify the exact account number and/or the FA Number associated with the "timer" client or broker. While some (but not all) fund companies had the ability to block or reject trades made in accounts or associated with FA Numbers that they had identified as associated with a timer client or broker, trades from PSI brokers placed under account numbers and/or associated with FA Numbers not yet identified and stopped would continue to be processed.

25.    By manipulating the identifying information sent by PSI over the NSCC system to the fund companies, the Druffner Group deceived fund companies into processing trades that would otherwise have been blocked or rejected. Principally, the two categories of identifying information the Druffner Group manipulated were the PSI account information and the FA Numbers.

10

**Account Number Manipulation**

26.     The Druffner Group's manipulation of account number information was relatively straightforward. The group set up and used multiple accounts for the clients. Each account had a different account number (or BIN number). Thus, when a particular fund company identified and stopped market timing in one account, the Druffner Group traded in another account under a different BIN number, one that had not yet been identified as a timer's account. When that account was flagged and stopped, the Druffner Group traded in yet another account, and so on.

27.     By 2003, the Druffner Group traded through approximately 183 accounts for their seven timer clients, as detailed below:

| Client | Number of Accounts |
|--------|--------------------|
| Headstart | 79 |
| Pentagon | 30 |
| Chronos | 24 |
| Jemmco | 22 |
| Ritchie | 20 |
| Lester | 6 |
| Graham | 2 |

28.     To make it even more difficult for fund companies to stop the activity, the Druffner Group and the group's clients opened many of the accounts using aliases. More specifically, the Druffner Group opened accounts using various shell entities with names that did not contain the clients' names. The Druffner Group and their clients opened these accounts because on some trades sent over the NSCC system, PSI provided the name of the client assigned to the BIN Number. Sometimes, when fund companies saw timing in one account, they identified other accounts with the same or similar names. The fund companies then monitored

11

those accounts and stopped them more quickly when they began timing. The alias accounts made it more difficult for the fund companies both to see that the accounts were linked to a client that had been stopped before in another account and to see that multiple timing accounts were related to one another.

29.     The chosen names for the entities included, for example, the name of a family dog, the nickname for a girlfriend of one of the hedge fund employees, various street names in neighborhoods where hedge fund personnel lived, a hedge fund employee's hometown, and, for two accounts, a variation on the name of a PSI back office employee.

30.     In addition to allowing the brokers to place trades in fund families following a block, the multiple accounts allowed the brokers to break their clients' trades into smaller dollar units. The Druffner Group knew that fund companies often monitored for market timing activity based on certain dollar thresholds. The Druffner Group knew that larger trades were more likely to be detected than smaller trades. In order to decrease the chances of detection, and to minimize the consequences if detected, the Druffner Group used the multiple accounts to divide the trades into smaller units.

31.     Often, the use of the multiple accounts required the Druffner Group to shift funds from one account to another. This was accomplished through a process called "journaling." It was a common practice for the Druffner Group to journal funds from one account that had been stopped by a fund company to another account that had not been stopped in order to keep trading. For example, in January 2001, after Franklin Templeton blocked some Chronos accounts, Druffner wrote to Chronos and recommended: "journaling the positions . . . into X-P4, X-P5, or X-P6 [other Chronos accounts] we don't currently hold Franklin in those accounts." Chronos

12

then agreed to move funds to X-P4 and try to trade. Similarly, in October 2001, CIBC

complained about the volume of journaling requested by the Druffner Group, calling the volume

of journaling "ridiculous." Ficken wrote back:

> Because we do not have wrap agreements, we have to be very fee
> sensitive. Therefore, we place money in smaller amounts, spread
> over more accounts in order to avoid detection, "kick outs" and
> eventual fees that damage performance. This necessity requires
> often times a more frequent need to journal money around.

## FA Number Manipulation

32.     The Druffner Group also manipulated the FA Number information provided with

their trades. Often, when fund companies identified repeated market timing in accounts

associated with a particular FA Number, the fund companies stopped accepting trades in

accounts associated with the FA Number. When that occurred, the Druffner Group changed the

FA Number associated with the accounts. As with the account numbers, when that FA Number

was eventually flagged and stopped, the Druffner Group changed the FA Number again, and so

on.

33.     One way the Druffner Group obtained new FA Numbers was by adding brokers to

the group. More brokers meant more FA Numbers that could be used to switch around on

accounts after a stop. Thus, in 2000, Druffner, the original member of the group, added Ficken,

and in 2001 added AJRO. Indeed, soon after Druffner hired AJRO in 2001, he informed AJRO

"I am glad you are here, because we can split up the accounts using more rep numbers," or words

to that effect. Almost immediately upon AJRO receiving his new FA Number (050), millions of

dollars of assets were journaled into accounts using that number.

13

34.     Another way the Druffner Group obtained new numbers was to create "joint"

numbers and "also" numbers. Each broker at PSI had an "individual" FA Number (i.e., a number

assigned just to that broker). PSI, however, allowed brokers working in teams to create "joint"

FA Numbers, which were numbers assigned to more than one broker. PSI assigned joint

numbers purportedly to allow brokers working as teams to set a commission split. For example,

Druffner and AJRO had a joint number "0AD," which purportedly split commissions 70/30

between Druffner and AJRO on trades submitted under that number. In addition, PSI issued a

number to brokers called an "also" number. "Also" numbers represented numbers assigned to

brokers purportedly to assist particular clients to access their account information electronically,

among other things.

35.     From 2000 through 2003, the Druffner Group obtained multiple "joint" and

"also" numbers. In fact, by mid-2003, the Druffner Group had obtained at least sixteen FA

Numbers, including "joint" and "also" numbers, in connection with their market timing

activities. These are set forth in the following table:

| DRUFFNER GROUP FA NUMBERS | | |
|---|---|---|
| Date Issued (Approx.) | FA Number | Brokers Assigned |
| 1996 | 014 | Druffner individual |
| 2/2/00 | 0MD | Druffner "also" |
| 3/2/00 | 015 | Ficken individual |
| 7/17/00 | 0DF | Druffner/Ficken "joint" |
| 5/4/01 | 050 | AJRO individual |
| 6/14/01 | 078 | Druffner/Ficken/AJRO "joint" |
| 10/19/01 | 0B6 | Ficken "also" |
| 10/24/01 | 0AF | AJRO/Ficken "joint" |

14

| DRUFFNER GROUP FA NUMBERS | | |
|---|---|---|
| 10/25/01 | 0M5 | AJRO "also" |
| 2/14/02 | 0AD | AJRO/Druffner "joint" |
| 8/26/02 | 0FD | Ficken/Druffner "joint" |
| 9/3/02 | 0DA | Druffner/AJRO "joint" |
| 1/8/03 | 023 | Ficken/AJRO "joint" |
| 4/21/03 | 086 | Brian Lake/Druffner "joint" |
| 4/21/03 | 004 | Lake/AJRO "joint" |
| 4/21/03 | 069 | Lake/Ficken "joint" |

36.     The Druffner Group used at least fourteen of these numbers to process trades in fund companies that had previously stopped their trading under another FA Number. Indeed, the Druffner Group obtained six of the sixteen FA Numbers *after* PSI had purportedly prohibited the issuance of new FA Numbers for market timing. When obtaining these numbers, the Druffner Group provided false and materially misleading information as to why they needed additional FA Numbers on forms PSI required to be submitted before new FA Numbers would be issued.

37.     For example, in August and September 2002 the Druffner Group applied for and obtained two new "joint" FA Numbers (0FD and 0DA). In the forms they signed and submitted to Prudential, the members of the group stated that the numbers were needed for a commission splitting purposes. Specifically, on one form they said that the new number was needed for "a change in percentage split"; and on the other form they said that the "credit for some existing and future clients needs to be distributed in the specific percentage split." These statements were false and materially misleading.

38.     The statements were false because the Druffner Group did not intend to use the numbers to adjust the percentage commission split and in fact did not use the numbers to split the

15

commissions. In fact, the Druffner Group split commissions according to a split of 70%
(Druffner)/20% (Ficken)/10% (AJRO). The Druffner Group had created an FA Number (078) to
split commissions 70/20/10 in 2001. After the new numbers were issued, the Druffner Group
routinely placed trades using the new FA Numbers and directed PSI to split the commissions
under the 70/20/10 split set up by FA Number 078.

39.    The statements were materially misleading because the Druffner Group
intentionally did not disclose on the form the fact that the numbers would be used for market
timing and to service existing market timing clients. After the numbers were issued, Ficken told
one of his clients that he had obtained a "fresh" FA Number for trading. He then began placing
market timing trades under the "fresh" FA Number in fund companies that had banned the
Druffner Group.

40.    The Druffner Group provided similar false and misleading information on
Prudential forms they submitted to obtain additional FA Numbers in January and April 2003.

## Intent and Willfulness

41.    The members of the Druffner Group were each actually aware that fund
companies objected to their trading and had blocked accounts and FA Numbers. The members
of the Druffner Group nevertheless manipulated the account information and FA Number
information with the specific intent to deceive the fund companies.

42.    The Druffner Group received repeated notifications from fund companies
informing them that their trading activity was prohibited. Sometimes the fund companies
notified the members of the Druffner Group directly by letter or telephone call; sometimes the
fund companies notified PSI's home office, which in turn forwarded the notification to the

16

members of the Druffner Group via e-mail. These notifications expressed the fund companies'

objections to the trading and requests to cease market timing. Many of them also contained the

fund companies' objections to the use of multiple accounts and FA Numbers.

43.      In addition, beginning in mid-2001, PSI installed a computerized system that

could, upon request from a fund company, block accounts or FA Numbers from trading before

being sent over the NSCC network. PSI received hundreds of requests from fund companies

requesting blocks on the Druffner Group and its client accounts and imposed hundreds of blocks

on accounts and FA Numbers. PSI notified the Druffner Group of blocks placed on the client

accounts and FA Numbers and forwarded to the Druffner Group copies of the fund companies'

requests.

44.      Often, however, the Druffner Group used the information provided to trade in

accounts and FA Numbers that had not yet been detected and blocked. The following table

provides an example of block requests related to the Ivy Funds in September 2002:

| Ivy Funds' Block Requests in September 2002 | | | |
|---|---|---|---|
| Date | Recipient | Notification/Direction to PSI | FA Numbers Identified |
| 9/4/02 | PSI Home Office | "We have a Prudential broker who has been blatantly timing in and out of various Ivy funds and we wish to cease this activity. Here is the information on him: Name: Shifter (sic) AJRO . . . We would like to suspend him from timing within the Ivy Funds" | 0AF; 0M5; 050 |
| 9/18/02 | PSI Home Office | "Can you please call or e-mail me with an update on what you have found [on the brokers identified on 9/4/02]. Over the last few months, these two brokers [Ficken and AJRO] have continued to trade and market time with Ivy Funds, using different rep ID's for every new trade. Their activity has even increased in the two weeks since [the 9/4/02 e-mail]." | |

17

| Ivy Funds' Block Requests in September 2002 | | | |
|---|---|---|---|
| 9/18/02 | PSI Home Office | "They appear to be creating a new REP ID every time they do a new trade. Also, when new business comes in under these REP ID's, no broker name appears on the trade. We have to call Prudential each time to confirm who it is, and it is either Skifter AJRO, Justin Ficken or both as a shared trade." | 0B6; 0MD; 050; 015; 0M5; 0AD |
| 9/19/02 | Ficken and AJRO | From PSI Home Office: "PLEASE BE ADVISED OF THE BELOW FA RESTRICTIONS FOR IVY FUNDS [attaching 9/4/02 and 9/18/04 e-mails from IVY]" | 0B6; 0MD; 050; 015; 0M5; 0AD |

45.    Following these notices, the Druffner Group purchased into the Ivy Funds using

FA Numbers not identified in the communications from Ivy Funds as having been associated

with the Druffner Group, as the following table shows:

| Additional Purchases: | Client/Account: | FA Number Used: |
|---|---|---|
| 1/17/03 | Chronos/Rodgars Als Inc. II | 0DA |
| 3/10/03 | Chronos/Rodgars Als | 0DA |
| 3/21/03 | Headstart/Marks Securities LLC II | 0DA |
| 3/28/03 | Headstart/Marks Securities LLC | 0DA |
| 4/22/03 | Lester/Williams Capital GP | 023 |
| 4/25/03 | Pentagon/M 10 | 0DA |
| 5/1/03 | Graham/Grayfish I | 086 |
| 5/8/03 | Pentagon/MP6 | 0DA |
| 5/15/03 | Headstart/Atlantis 401-1Limited | 0DA |
| 5/15/03 | Headstart/Mandrake 401-5 Ltd. | 0FD |
| 5/21/03 | Jemmco/Virgo Capital LLC | 0DA |

46.    In addition to the regular notification they received when Prudential imposed a

block, in May 2002, the Druffner Group also obtained from the PSI operations area a printout of

the PSI blocking system recording the multiple blocks that had been put on the group's client

accounts and FA Numbers. The Druffner Group then used that information to trade in accounts

and under FA Numbers that had not yet been blocked.

18

47.    The Druffner Group's communications to clients also demonstrate that the

members of the Druffner Group specifically intended to evade detection and/or to bypass fund

companies' blocks on the trading activity. These communications included such subjects as (a)

the use of different tax identification numbers on accounts, (b) the creation of additional

accounts, (c) the structuring of trades to avoid detection, (d) information obtained from corrupt

employees of fund companies on how to avoid the timing detection controls, (e) the types of

funds that fund companies were less likely to watch, and (f) the use of different FA Numbers to

process trades that were blocked. For example, and without limitation:

> In or about December 2001, Druffner and Ficken met with one of
> their market timing clients and asked him to set up the Prudential
> accounts in the name of entities with two "clean" tax identification
> numbers. The purpose of the "clean" tax identification numbers
> was to disguise the connection of the Prudential accounts with the
> client's other market timing accounts at other brokerage firms that
> had been stopped by fund companies.
>
> In or about January 2002, Ficken wrote to the Pentagon traders that
> he had not traded in Pilgrim Funds "due to my internal source
> advising me to 'lay low.'"
>
> In or about March 2002, Druffner wrote to a trader at Chronos and
> suggested trading in "C" class shares for PIMCO Funds. When
> asked why, Druffner stated: "we have found that with pimco keeps
> a close eye on the A shares and not as much on the C."
>
> In or about March 2002, a trader at Chronos reported that Ficken
> had "asked if we could consider opening a new ZCM account. He
> said that ZCM is lenient about opening new accounts, and will
> open more than one account per entity. He said we could open an
> 'Oxbo 2', for example."
>
> In or about May 2002, a trader at Pentagon asked Ficken: "I've just
> heard on the street Alliance [Capital Management] are now
> monitoring any trades over $200k. May be we need to keep them
> below $200k for a longer stay."

19

In or about July 2002, Ficken wrote to his contact at Jemmco about the use of FA Numbers to evade the funds' blocks: "The other day, Deutsche stopped a couple of our rep IDs which were used to trade BTEQX in both Sequential and Sherlock. We changed the rep IDs to trade the positions yesterday and Deutsche still rejected them." The contact wrote back: "Any other ideas to get them in for the future? New account number? or not worth the trouble for that size?"

In or about September 2002, Ficken wrote to Pentagon about the problems of market timing international mutual funds: "However, since it's clear the trading just international funds is virtually impossible to do with and (sic) legitimate success (unless you are just burning through fresh brokers), it would be a bit more helpful for you guys to be more flexible with what you trade."

In or about October 2002, Ficken wrote to a contact at Pentagon who had expressed concerns over the volume of "kickouts" about four new accounts that he was opening; in it, Ficken mentioned that he would then use the accounts to make purchases into Ivy Funds, which had earlier banned him from investing: "I'm working on paper work for four new Accounts in both Management and Performance - which is where the new platform will be best utilized. Ivy will be moved into those new Accounts."

In or about November 2002, Ficken wrote to a contact at Jemmco listing eleven Jemmco accounts they were using and stated: "Any new entities with new tax ID #s would be great!" The Jemmco contact subsequently wrote back: "We are currently in the process of opening additional accounts. Just waiting for confirmation on the Tax ID numbers." Ficken wrote back: "How many Accounts are we opening? I know we are going to open three new Offshore Accounts, mirroring the current three we have. However, as for new Accounts domestically based, I don't have any info on new ones." The contact then said that they were "working on some new names." In or about December 2002, Jemmco opened additional accounts at Prudential.

In or about December 2002, Ficken wrote to a Jemmco contact: "ING/Pilgrim snagged the rep ID that we were using for you guys - therefore, I had to redeem out of the positions, rather than exchange out."

20

In or about November 2002, Ficken wrote to a client about splitting trade sizes to avoid detection by Pioneer Funds: "Pioneer doesn't monitor trades under $25,000, so I figure we can do $20,000 in both Accounts."

In or about December 2002 and January 2003, AJRO informed a trader at Chronos that one of the Chronos accounts, referred to as "XP-1," was like an "albatross" around his neck because it had been kicked out of so many fund families. Chronos then created another account, "XP-7," and $4.6 million was journaled into it from other accounts, including XP-1.

In or about March 2003, Ficken wrote to Jemmco: "I've been advised by a reliable contact over at ING to avoid exchanges today (the warning goes back to Wednesday). Therefore, I'd like to hold back the three positions ready to go today (totalling $335,112.78) until Monday."

In or about June 2003, in response to an inquiry from Pentagon as to whether Prudential could trade $50 million in additional money, Ficken wrote: "Yes, $50 million is certainly achievable. However, we will need some new Accounts. Further, I would suggest that you scale in the money, rather than buying all at once. (I figure that you wouln't (sic) send me $50 million at one shot anyway)."

48.     The Druffner Group also made false statements to fund companies seeking to

identify who was conducting the market timing trading. Fund companies often called the PSI

Boston branch seeking the identity of the brokers associated with certain FA Numbers. At first,

the PSI receptionist received the calls and identified the Druffner Group as being associated with

the FA Numbers. At some point in time, Druffner instructed the receptionist to forward all calls

from fund companies directly to his sales assistant. Druffner then instructed his sales assistant to

not tell the fund companies that the FA Numbers were associated with members of the Druffner

Group. The sales assistant followed Druffner's instructions and upon receipt of calls asking the

identity of the brokers placing the market timing trades, falsely denied knowing what brokers

21

were associated with the FA Number connected to the trading. As Druffner instructed, she took a message and then did not return the calls.

## AJRO's Conduct

49.     AJRO joined Druffner and Ficken in April 2001. AJRO came from another brokerage firm, where he had been a retail broker since approximately 1998. AJRO had been a college friend of Druffner's and Druffner asked him to work at PSI to support Druffner's growing market timing business. The PSI branch manager hired AJRO for the specific purpose of supporting Druffner and Ficken in the timing business.

50.     By the time AJRO was hired, many mutual funds had identified substantial timing activity in Druffner's and Ficken's client accounts. Funds had rejected trades in the clients' accounts and had begun rejecting trades placed under their FA Numbers. The rejections were often accompanied by written and oral communications from fund companies informing Druffner and Ficken, variously, that the timing activity was not permitted, that their clients' trading privileges were revoked, and that Druffner's and/or Ficken's trading privileges were revoked.

51.     When AJRO joined the Druffner Group, Druffner explained to AJRO that blocking letters from funds were, in these or similar words, "part of the business." Druffner further explained to AJRO that when excessive timing activity occurred in accounts associated with AJRO's FA Number, fund companies would eventually identify AJRO by name and, in some cases, call him. Druffner and Ficken instructed AJRO on what he should and should not say if called by fund companies. They instructed him to say only that his clients were sophisticated investors. They also instructed him to say that he had been out of the office when the offending trading had occurred. They told him not to disclose that the client was a hedge

22

fund doing quick trades. They told him not to disclose that money from a single client was trading in multiple accounts. They also told him not to disclose that he was working with Druffner or Ficken. Subsequently, AJRO received such calls and followed Druffner's and Ficken's instructions.

52.     Along with the other two members of the Druffner Group, AJRO participated in defrauding many different mutual fund companies. Among the mutual fund companies AJRO defrauded were The Hartford Mutual Funds ("Hartford Funds") and the American Funds ("American Funds").

## The Hartford Funds

53.     Hartford Funds is a fund company affiliated with The Hartford Financial Services Group. From at least 2001 through 2003, AJRO, acting in concert with Druffner and Ficken, used a variety of deceptive and fraudulent acts and practices to place prohibited market timing trades in Hartford Funds on behalf of the Druffner Group's timer hedge fund clients.

54.     Beginning at least as early as January 2001, Hartford Funds sent letters to Druffner and Ficken objecting to the market timing trades they were placing on behalf of the timer clients. In these letters, the Hartford Funds repeatedly requested that Druffner and Ficken cease the market timing trades. When the trading did not stop, the Hartford Funds terminated the trading privileges for accounts identified as timing accounts.

55.     Each time the Hartford Funds froze an account, however, Druffner and Ficken would conduct market timing trades through a different account. Many of these accounts were accounts controlled by Headstart, the Druffner Group's largest client.

23

56.     Eventually, the Hartford Funds identified Druffner as a repeat offender. On or

about May 17, 2001, shortly after AJRO joined the Druffner Group, the Hartford Funds wrote to

Druffner terminating his trading privileges with the Hartford Funds. That letter stated, among

other things:

> For the past several months now, I have been sending you letters
> regarding your market timing activities using The Hartford Mutual
> Funds. I have sent you warnings that your trading behavior
> violates the policies and procedures established by The Hartford
> Mutual Funds, and I have terminated your exchange privileges on
> more than one occasion. Despite the warnings and terminations,
> you simply close one account and open another account. And, you
> continue to violate our prohibitions on market timing.
>
> Therefore, The Hartford Mutual Funds will, as of June 18, 2001,
> no longer open new accounts with you as broker of record and will
> not allow you to effect any trades on any accounts, new or old, as
> of that date.

Hartford Funds sent a similar letter to Ficken on or about August 9, 2001.

57.     PSI trading records reveal, however, that shortly after the Hartford Funds had

terminated Druffner's trading privileges, the Druffner Group made nearly $1 million of purchases

into the Hartford Funds using AJRO's FA Number. Many of these purchases occurred in

Headstart's "alias" accounts. Each purchase was followed by excessive exchange activity that

the Hartford eventually blocked. The trading included the following:

| Date | Client | "Alias" Account Name | BIN number | FA Number | Purchase Amount |
|------|--------|---------------------|------------|-----------|-----------------|
| 6/8/01 | Headstart | Isis 401 Limited 2 | 041-96588 | 050 (AJRO) | $230,000 |
| 7/11/01 | Headstart | Oberon 401 Limited 2 | 0BB-96790 | 050 (AJRO) | $250,000 |
| 7/11/01 | Headstart | Isis 401 Limited 4 | 041-96600 | 050 (AJRO) | $250,000 |
| 8/10/01 | Headstart | Oberon 3 | 0BB-96798 | 050 (AJRO) | $250,000 |

24

On at least three of these purchases, AJRO diverted a percentage of the commissions to Druffner.

58. The Druffner Group made these purchases using AJRO's FA Number because Druffner, Ficken and AJRO knew that AJRO's FA Number was "clean," meaning that the Hartford Funds had not yet flagged either AJRO or his FA Number as being associated with market timing, and the trades would be processed. The Druffner Group made these trades with the specific intent to deceive the Hartford Funds into processing trades it would not have processed had it known the trades were in fact being conducted for or on behalf of Druffner and his timer clients.

59. Eventually, the Hartford Funds flagged AJRO as a timing broker and, by letter dated September 28, 2001, terminated his trading privileges, effective November 1, 2001. The Hartford Funds' letter was similar to the letters it had sent terminating Druffner's and Ficken's trading privileges.

60. Despite being banned from the Hartford Funds, AJRO (and the other members of the Druffner Group) continued to trade in Hartford Funds. Instead of placing trades using his own individual FA Number, however, AJRO (and the other members of the group) placed the trades using "joint" and "also" numbers.

61. The Druffner Group's purchases into the Hartford Funds using "joint" and "also" numbers included the following, all placed after AJRO had been banned from the Hartford Funds:

| Date | Client | Alias Account Name | BIN Number | FA Number | Purchase Amount |
|------|--------|--------------------|------------|-----------|-----------------|
| 1/4/02 | Pentagon | Pent.Perf. 9 | ERS-95323 | 0AF (AJRO/Ficken Joint) | $225,000 |

25

| 1/30/02 | Headstart | CIBC | 041-96613 | 0M5 (AJRO also) | $250,000 |
|---------|-----------|------|-----------|-----------------|----------|
| 2/5/02 | Headstart | Windsor 401-2 Limited | ERS-95331 | 078 (Druffner/Ficken/AJRO Joint) | $200,000 |
| 2/11/02 | Ritchie | CIHI | 0BB-96807 | 0B6 (Ficken Also) | $270,000 |
| 2/11/02 | Ritchie | CIHI | ERS-95316 | 0M5 (AJRO Also) | $200,000 |
| 2/19/02 | Pentagon | P10 | ERS-95328 | 0DF (Druffner/Ficken Joint) | $150,000 |
| 3/5/02 | Headstart | Mercutio 401 Limited 4 | ERS-95332 | 0AD (AJRO/Druffner Joint) | $200,000 |
| 3/5/02 | Headstart | Levi 401 Limited 4 | 041-96617 | 0AD (AJRO/Druffner) | $200,000 |

62. The Druffner Group, including AJRO, placed these trades knowing that, had the Hartford Funds been aware that the trades were coming from AJRO, the fund company would have rejected or blocked the trades. Indeed, during the period of time that the members of the group were placing trades under "joint" and "also" numbers, the Druffner Group attempted to place at least one additional trade under AJRO's individual FA Number (050), which Hartford Funds rejected.

63. Eventually, the Hartford Funds detected the Druffner Group's use of multiple FA Numbers to place timing trades, and informed PSI. In May and June 2002, the Hartford Funds requested PSI to block all trading from the Druffner Group (and other PSI brokers).

64. Following this communication, in August and September 2002, the Druffner Group obtained from PSI two new "joint" FA Numbers. These numbers included a "joint" number between Ficken and Druffner (0FD) and a joint number between AJRO and Ficken (0DA). Despite the Hartford Funds' request to PSI that it block all trading from the members of

26

the Druffner Group, the group began to place trades using the new FA Numbers in the Hartford
Funds.

65.     In November 2002, the Hartford Funds again complained to PSI about Druffner,
Ficken and AJRO placing trades using additional FA Numbers, including 0FD and 0DA. The
Hartford Funds again requested that the activity cease.

66.     Following the November 2002 letter from the Hartford Funds, AJRO and Ficken
obtained yet another "joint" FA Number (023). Using that FA Number, AJRO and Ficken
purchased into fund companies that had banned them, including the Hartford Funds. PSI trading
records show the following purchases and attempted purchases into the Hartford Funds using FA
Number 023:

| Date | Client | Alias Account Name | BIN Number | FA Number | Purchase Amount |
|---|---|---|---|---|---|
| 4/8/03 | Headstart | Spencer Securities LLC II | 041-83559 | 023 | $99,994.74 |
| 6/20/03 | Headstart | Aquilla 410-4 Ltd. | 0BB-96882 | 023 | $175,000 |
| 7/10/03 | Headstart | Spencer Securities LLC II | 041-83559 | 023 | $899,994.75 (blocked) |
| 8/27/03 | Headstart | Atlantis 401-2 Ltd. | 041-96628 | 023 | $200,000 (blocked) |
| 8/27/03 | Headstart | Oberon 401 Limited 2 | 0BB-96790 | 023 | $150,000 (blocked) |

67.     AJRO engaged in all of these trades with the specific intent to deceive the
Hartford Funds into processing trades it would not otherwise have processed.

27

## American Funds

68.     The American Funds is a fund company based in Los Angeles, California. AJRO,

acting in concert with Druffner and Ficken, used a variety of deceptive and fraudulent acts and

practices to place prohibited market timing trades in the American Funds on behalf of the

Druffner Group's timer hedge fund clients.

69.     Beginning at least in 1999, the American Funds had complained to Druffner and

to Ficken about their pattern of market timing in the American Funds. In 1999 and 2000, the

American Funds had complained directly to Druffner about timing activity in Headstart and

Chronos accounts. In 2001, American Funds had complained directly and repeatedly to Ficken

about timing in Headstart, Pentagon and Ritchie accounts. For example, in August 2001

American Funds notified Ficken that:

> American Funds Distributors will not tolerate abusive exchange
> activity due to the burden it places on other fund shareholders. As
> a result, American Funds Distributors will reject all purchase
> orders, including exchange purchase orders, for [the Headstart alias
> account listed] effective immediately, as outlined in the prospectus.
>
> Additionally, we are providing this notification to officially inform
> you that American Funds Distributors does not wish to receive any
> future investments on behalf of [the Headstart alias account listed]
> or any other clients in which exchange activity is anticipated and is
> part of the client's objective.

American Funds sent similar notifications in November and December 2001 for trading the

Druffner Group was conducting in other "alias" accounts. Many of the trades were conducted

under Ficken's and, eventually, AJRO's FA Numbers, with a percentage of the commissions

being kicked back to Druffner.

28

70.     In January 2002, American Funds complained directly to the PSI home office about the multiple accounts and timing trades. American Funds stated that it was "very concerned about abusive exchange activity due to the burden it places on other fund shareholders." American Funds provided a list of clients it was banning from the funds as well as a list of PSI brokers. Included on the list of clients banned were a number of Ritchie and Headstart alias accounts. Included in the list of banned brokers was Ficken.

71.     On or about May 21, 2002, the Druffner Group made a purchase into the American Funds using AJRO's FA Number, this time on behalf of "JST Pan, Inc." ("JST Pan"), through an account named JST Pan, Inc. II (the "JST Pan account"). This was one of the Chronos-managed "alias" accounts. JST Pan was a "special purpose vehicle" created by ZCM as part of its arrangement with Chronos to finance Chronos' market timing business. The account was identified as a ZCM account, with no explicit information linking it to Chronos (which American Funds had complained about as far back as 1999). After detecting abusive trading, American Funds called AJRO and told him that the activity was prohibited. American Funds also informed AJRO that it had past experience with ZCM conducting frequent exchange activity. During the conversation, AJRO stated that he was "meeting with his client" to let them know. AJRO did not inform American Funds of his association with Ficken and Druffner or of JST Pan's association with other timing accounts managed by Chronos and owned by ZCM.

72.     One month later, on or about June 24, 2002, American Funds noticed additional exchanges in the JST Pan account. American Funds called AJRO to discuss the activity. AJRO spoke to the American Funds employee and falsely told her that he had been "out one day" and his client had made an exchange. AJRO also did not tell the American Funds employee that he

29

was associated with Druffner and Ficken or that the Druffner Group's clients were using multiple accounts to trade in the American Funds. The American Funds employee informed him that there had been five exchanges in the JST Pan account and that the American Funds would reject any future purchase and exchange orders. The American Funds then sent a letter confirming the conversation. The American Funds stated, among other things, that it did not wish "to receive any future investments on behalf of this client or any other client in which exchange activity is anticipated or is part of the client's objective." AJRO understood that the direction from American Funds was not limited to the individual account. AJRO understood that it applied to any and all accounts.

73.     Following that communication with AJRO, the American Funds investigated AJRO further and discovered two of the "joint" FA Numbers he had, one with Druffner and one with Ficken. On or about September 4, 2002, the American Funds called the Druffner Group's branch manager, Robert Shannon ("Shannon"), and informed him of what American Funds had discovered. The American Funds employee also told Shannon that she had now identified many different account numbers linked to the three and in all of the accounts they were "day trading." She also said that American Funds: "did not want any of the three to ever sell our funds again."

74.     The American Funds then began to research the accounts that might be linked to the Druffner Group and discovered nearly $9 million in accounts trading in the American Funds linked to the Druffner Group. These accounts were trading in the names of "alias" accounts owned by Headstart, Pentagon, Ritchie, Chronos and Jemmco. The American Funds then sent a letter to Shannon, informing him of the results of the research the American Funds had

conducted, that the American Funds would reject all future purchase and exchange orders, and

that:

> Since we have had conversations with Mr. Martin Druffner dating
> back to 1999, Mr. Skifter Ajro and Mr. Justin Ficken dating back
> to 2001, regarding frequent trading, American Funds Distributors
> officially requests that Mr. Druffner, Mr. Ajro and Mr. Ficken
> make no further investments in American Funds.

Shannon then met with the members of the Druffner Group and discussed this communication.

Druffner falsely told Shannon that the group would not trade in American Funds again.

75.    Approximately one month later, in October 2002, the Druffner Group began

purchasing into American Funds. From October 11, 2002 through January 15, 2003, the

Druffner Group made at least twenty purchases into the American Funds using (a) account

numbers created after American Funds had banned them in September 2002, or (b) account

numbers that American Funds had not included on its September 2002 communications to

Shannon. The Druffner Group also deployed two new FA Numbers (0FD and 0DA) that the

members had obtained shortly before American Funds banned them. Examples of such

purchases are detailed below:

| Date | Client | Alias Account Name | BIN Number/Date Opened | FA Number/Date Created (approx.) |
|------|--------|--------------------|------------------------|----------------------------------|
| 10/11/02 | Headstart | Credit Lyonnais | 0BB-96870 (9/24/02) | 0DA (9/3/02) |
| 10/22/02 | Headstart | Credit Lyonnais | 041-96627 (10/21/02) | 0DA (9/3/02) |
| 10/30/02 | Chronos | Rodgars Als, Inc. II | 041-96626 (8/7/02) | 0DA (9/3/02) |
| 10/31/02 | Jemmco | Raleigh Capital, LLC | ERS-05758 (4/4/02) | 0DA (9/3/02) |
| 11/11/02 | Lester | Schumann Capital, GP | ERS-05759 (4/29/02) | 0FD (8/26/02) |

| 11/13/02 | Pentagon | Management Limited 401-12 | ERS-95341 (11/7/02) | 0DA (9/3/02) |
|---|---|---|---|---|
| 11/18/02 | Pentagon | Performance 12 401-Limited | 0BB-96877 (11/7/02) | 0DA (9/3/02) |
| 11/25/02 | Headstart | Credit Lyonnais | 0BB-96870 (9/24/02) | 0DA (9/3/02) |
| 11/25/02 | Headstart | Credit Lyonnais | 041-96627 (10/21/02) | 0DA (9/3/02) |
| 11/29/02 | Jemmco | Sequential Capital LLC | 041-83266 (4/4/02) | 0FD (8/26/02) |
| 12/5/02 | Pentagon | Pentagon Special Purpose Fund | 0BB-19960 (3/13/00) | 0FD (8/26/02) |
| 12/6/02 | Headstart | Credit Lyonnais | ERS-95347 (12/2/02) | 0DA (9/3/02) |
| 12/6/02 | Lester | Williams Capital GP | 0BB-22501 (12/18/01) | 0FD (8/26/02) |
| 12/27/02 | Pentagon | Performance Limited 13 | ERS-95351 (12/23/02) | 0DA (9/3/02) |
| 12/27/02 | Pentagon | Management LTD 13 | 0BB-96889 (12/23/02) | 0DA (9/3/02) |
| 1/2/03 | Headstart | Mandrake 401-5 Ltd. | ERS-95348 (12/5/02) | 0FD (8/26/02) |
| 1/6/03 | Jemmco | Liverpool Capital LLC | ERS-05756 (4/4/02) | 0DA (9/3/02) |
| 1/6/03 | Headstart | Credit Lyonnais | 0BB-96899 (1/6/03) | 0DA (9/3/02) |
| 1/8/03 | Headstart | Credit Lyonnais | ERS-95352 (1/6/03) | 0DA (9/3/02) |
| 1/15/03 | Jemmco | Triad International Ltd. | 041-96618 (4/26/02) | 0FD (8/26/02) |

76.    From January 23, 2003 through February 24, 2003, the Druffner Group made approximately twenty-one additional purchases into the American Funds using multiple accounts and FA Numbers.   The trading included the use of "also" FA numbers (0MD (Druffner), 0B6 (Ficken), and 0M5 (AJRO)) and "joint" numbers, including the Druffner/AJRO number 0DA that had been created in September 2002. Ficken and AJRO also began trading under FA Number 023, the "joint" number they had created on or about January 8, 2003.

32

77.    In early February 2003, American Funds again made an effort to stop the Druffner Group (and other PSI brokers) from placing timing trades in the funds. This time, American Funds communicated with PSI's home office to see if the PSI home office would stop their activity. On or about February 11, 2003, American Funds requested that PSI "shut down immediately" Druffner, Ficken and AJRO. On February 18, 2003, American Funds detected continued timing from Druffner, Ficken and AJRO and notified PSI that the brokers continued to time the funds. American Funds again requested that PSI shut them down "immediately." The PSI home office forwarded this request directly to AJRO and Ficken.

78.    PSI's trading records reveal that, following this notification, AJRO, Ficken and Druffner switched to trading under the group's most recently acquired FA Number (023), which American Funds at that time had not yet detected. Using this number, they made both exchanges and purchases, including the following:

| Date | Client/Account | FA Number From: | Fa Number To: | Purchase/Exchange |
|------|----------------|-----------------|---------------|-------------------|
| 2/20/03 | Lester/Williams Capital GP | 0FD | 023 | Exchange |
| 2/20/03 | Jemmco/Nautical Capital | 0FD | 023 | Exchange |
| 2/21/03 | Lester/Schumann Capital GP | 0FD | 023 | Exchange |
| 3/6/03 | Chronos/Havers Inc. II | 015 | 023 | Purchase |
| 4/2/03 | Chronos/Evbo II | 050 | 023 | Purchase |

79.    In addition, on February 27, 2003, the Druffner Group opened two new "alias" accounts for Pentagon ("Pentagon Perform 14" and "Pentagon Management 14") and associated them with the new FA Number (023). Then, on February 28, 2003, the Druffner Group

33

purchased into the American Funds using those account numbers and FA Number 023.

Similarly, on March 4, 2003, the Druffner Group opened another "alias" account for Headstart,

"Spencer Securities II," and associated it with FA Number 023. On April 8, 2003, the Druffner

Group then made a purchase into the American Funds using Spencer Securities II and FA

Number 023.

      80.     American Funds detected the trading under FA Number 023 and complained to

PSI's home office in March 2003 and again in April 2003, both times reiterating that Ficken and

AJRO had been banned from American Funds and requesting PSI to terminate the activity. In

May 2003, PSI blocked FA Number 023, prompting Ficken to write to a client: "American

finally clipped my last rep id."

      81.     On or about May 15, 2003, PSI notified Druffner, Ficken and AJRO that FA

Number 023 was prohibited from any further activity in American Funds.

      82.     Notwithstanding this notice and the multiple earlier notices from American Funds,

on or about June 26, 2003, AJRO, knowing he was prohibited from any further trading in

American Funds, made two purchases into the American Funds for a new timer client, Graham.

This time, AJRO used an FA Number (086) that had been assigned to the Druffner Group in

April 2003 in connection with the Druffner Group's new association with Graham. AJRO

specifically purchased into the American Funds because he knew that American Funds had not

yet detected either the Graham account (called Grayfish I) or the new FA Number (086).

      83.     AJRO engaged in all of these trades with the specific intent to deceive American

Funds into processing trades it would not otherwise have processed.

## AJRO's Financial Gain

84.    Approximately 90% of the commissions generated under AJRO's FA Numbers were diverted to Druffner and Ficken.  AJRO kept approximately 10% of the commissions.

85.    According to PSI's commission records, for the period 2001 through 2003, approximately $945,000 in gross commissions was attributable to AJRO.  Of that amount, PSI's records show that $745,000 were gross commissions generated after PSI had received a request from a fund company to cease market timing.  AJRO received a net payout of approximately 35%, which means that AJRO received net commissions of approximately $250,000 from trading in funds following a block request to PSI.

## COUNTS ONE AND TWO
## Wire Fraud
## 18 U.S.C. § 1343

86.     The United States Attorney re-alleges and incorporates by reference paragraphs 1-85 of this Information and further charges that:

87.     On or about the dates set forth below, in the District of Massachusetts and elsewhere, the defendant SKIFTER AJRO having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises concerning material facts and matters, for the purpose of executing and attempting to do so, did take and receive matters and things sent and delivered via interstate wire communications such matters and things, as follows:

| COUNT | DATE | WIRE COMMUNICATION |
|---|---|---|
| 1. | June 20, 2003 | Purchase order of approximately 12,589 shares of Hartford ADV Fund (symbol ITTAX) for Aquilla 410-4 Ltd., BIN Number 0BB-96882, transmitted from PSI branch office in Boston, Massachusetts to PSI home office in New York, New York. |
| 2. | June 26, 2003 | Purchase order of approximately 7221 shares of Growth Fund of America (symbol GFACX) for Grayfish MFA I LLC, BIN Number 0BB-23866, transmitted from PSI branch office in Boston, Massachusetts to PSI home office in New York, New York. |

All in violation of 18 U.S.C. § 1343.

36

## COUNTS THREE AND FOUR
### Securities Fraud
### 15 U.S.C. §§ 78j(b) & 78ff(a)

88.     The United States Attorney re-alleges and incorporates by reference paragraphs 1-85 of this Information and further charges that:

89.     At various dates in the District of Massachusetts and elsewhere, SKIFTER AJRO, defendant herein, did knowingly and willfully, by the use of means and instrumentalities of interstate commerce and of the mails, directly or indirectly (a) employed a device, scheme and artifice to defraud, (b) made untrue statements of a material fact and omitted to state a material fact necessary in order to make statements made, in light of the circumstances under which they were made, not misleading, and (c) engaged in acts, practices and courses of business which operated as a fraud and deceit upon persons, in connection with the purchase and sale of securities, including the purchase and sale of the following securities on or about the dates set forth below:

| COUNT | DATE | PURCHASE/SALE OF SECURITIES |
|-------|------|------------------------------|
| 3. | March 5, 2002 | Purchase order of approximately 13,324 shares of Hartford ADV Fund (symbol ITTAX) for Mercutio 401 Limited 4, BIN Number ERS-95332, transmitted from PSI branch office in Boston, Massachusetts to PSI home office in New York, New York. |
| 4. | April 2, 2003 | Purchase order of approximately 15,553 shares of American High Income Fund (symbol AHTCX) for Evbo Inc. II, BIN Number 041-96625, transmitted from PSI branch office in Boston, Massachusetts to PSI home office in New York, New York. |

All in violation of 15 U.S.C. §§ 78j(b) & 78ff(a) and 17 C.F.R. § 240.10b-5.

37

MICHAEL J. SULLIVAN
UNITED STATES ATTORNEY

Jack W. Pirozzolo
Assistant United States Attorney

DISTRICT OF MASSACHUSETTS August 2, 2005

JS 45 (5/97) - (Revised USAO MA 3/25) **05** CR **1 0 1 9 4 N M G**

**Criminal Case Cover Sheet**                                      U.S. District Court - District of Massachusetts

**Place of Offense:** _Massachusetts_    **Category No.** _III_    **Investigating Agency** _USPIS_

**City** _Boston_    **Related Case Information:**

**County** _Suffolk_

Superseding Ind./ Inf. _No_    Case No. _N/A_
Same Defendant _N/A_    New Defendant _N/A_
Magistrate Judge Case Number _N/A_
Search Warrant Case Number _04-M00022-LPC_
R 20/R 40 from District of _____

**Defendant Information:**

Defendant Name _Skifter Ajro_    Juvenile    ☐ Yes    ☒ No

Alias Name _____

Address _73 Camp Street, Milford MA 01757_

Birth date (Year only): _1968_ SSN (last 4 #): _4454_ Sex _M_ Race: _Caucasian_ Nationality: _USA_

**Defense Counsel if known:** _Daniel Rabinovitz, Esq._    **Address:** _Menard, Murphy & Walsh_
_60 State St., Boston, MA 02109_

**Bar Number:** _____

**U.S. Attorney Information:**

**AUSA** _Jack W. Pirozzolo_    **Bar Number if applicable** _564879_

**Interpreter:**    ☐ Yes ☒ No    List language and/or dialect: _____

**Matter to be SEALED:**    ☐ Yes    ☒ No

☐ **Warrant Requested**    ☒ **Regular Process**    ☐ **In Custody**

**Location Status:**

**Arrest Date:** _____

☐ Already in Federal Custody as _____ in _____.
☐ Already in State Custody _____    ☐ Serving Sentence    ☐ Awaiting Trial
☐ On Pretrial Release:    Ordered by _____ on _____

**Charging Document:**    ☐ Complaint    ☒ Information    ☐ Indictment

**Total # of Counts:**    ☐ Petty _____    ☐ Misdemeanor _____    ☒ Felony _4_

**Continue on Page 2 for Entry of U.S.C. Citations**

☒    I hereby certify that the case numbers of any prior proceedings before a Magistrate Judge are accurately set forth above.

**Date:** _8/2/05_    Signature of AUSA: _____

JS 45 (5/97) - (Revised USAO MA 3/25/02) Page 2 of 2 or Reverse    05 CR 1 0 1 9 4 NMG

**District Court Case Number** (To be filled in by deputy clerk): _____

**Name of Defendant**    Skifter Ajro _____

**U.S.C. Citations**

| Index Key/Code | Description of Offense Charged | Count Numbers |
|---|---|---|
| Set 1   18 U.S.C. § 1343 | Wire Fraud | 1-2 |
| Set 2   15 U.S.C.§§ 78j(b)& ff(a) | Securities Fraud | 3-4 |
| Set 3 | | |
| Set 4 | | |
| Set 5 | | |
| Set 6 | | |
| Set 7 | | |
| Set 8 | | |
| Set 9 | | |
| Set 10 | | |
| Set 11 | | |
| Set 12 | | |
| Set 13 | | |
| Set 14 | | |
| Set 15 | | |

**ADDITIONAL INFORMATION:** _____

_____

_____

js45.information.wpd - 1/15/04 (USAO-MA)